**William TOSTE, Petitioner,**

v.

**Raymond M. LOPES, Respondent.**

**Civ. No. H–86–786(JAC).**

United States District Court,
D. Connecticut.

Dec. 31, 1987.

Joseph Bruckmann, Asst. Public Defender, New Haven, Conn., for petitioner.

Richard Jacobson, Asst. State's Atty., Bridgeport, Conn., for respondent.

### MEMORANDUM OF DECISION ON PETITION FOR WRIT OF HABEAS CORPUS

JOSÉ A. CABRANES, District Judge.

The petitioner is an inmate at the Connecticut Correctional Institution in Somers. He brings this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petitioner's sole claim is that the state obtained his conviction "by use of ... statements admitted without a sufficient showing that he had made a knowing and intelligent waiver of the constitutional rights described in *Miranda v. Arizona,* 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] (1966)." Amendment of Petition (filed March 9, 1987). For the reasons set forth below, the petition for a writ of habeas corpus is denied.

### I. Background

#### A.

In a federal habeas corpus proceeding under 28 U.S.C. § 2254(d), state

court findings of fact are accorded a presumption of correctness. *See, e.g., Ford v. Wainwright,* 477 U.S. 399, 106 S.Ct. 2595, 2602–03, 91 L.Ed.2d 335 (1986); *Sumner v. Mata,* 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982). The presumption applies to findings made either by a state trial court or an appellate court. *See Sumner v. Mata,* 449 U.S. 539, 544–47, 101 S.Ct. 764, 767–69, 66 L.Ed.2d 722 (1981). This court must defer to state court findings of fact unless it finds either that one of the factors listed in 28 U.S.C. § 2254(d) is applicable or that the petitioner presents "convincing evidence" which demonstrates that the findings are not supported by the record. *See Rushen v. Spain,* 464 U.S. 114, 120, 104 S.Ct. 453, 456, 78 L.Ed.2d 267 (1983) (per curiam); *Sumner v. Mata,* 455 U.S. at 593, 102 S.Ct. at 1305. In the instant case, the court has thoroughly reviewed the submissions of the parties, which include stipulations of fact and the trial transcript. Because they are supported by the record, the court adopts the following facts as found by the Connecticut Supreme Court. *See Kampshoff v. Smith,* 698 F.2d 581 (2d Cir.1983) (adopting state court findings verbatim).

> On the morning of December 20, 1974, the defendant bought and drank some beer and went to the home of Mavis Hardy on Upton Street in Bridgeport. Hardy lived there with her son, Phillip Monteith, who was a friend of the defendant. Hardy had previously refused the defendant's request to move in and live with her son "like a brother." No one was home at the time he approached the house, so he gained entrance by breaking a window. He searched the house for money and took some coins and two watches. When he heard a car in the driveway, he went into the basement. Through a window, he saw that Hardy had come home. The defendant then took a pair of tinsnips, put on a pair of gloves and put a towel over his face. When Hardy went into the kitchen, he went upstairs and hit her twice in the head with the tinsnips. He then grabbed a knife and stabbed her in the back approximately twenty times. He also took

> a longer knife, a fork and a nail file and stabbed her again repeatedly.

> The defendant fled the house, taking the victim's car. He was arrested later that day after becoming involved in two accidents with the stolen car. His clothes were spattered with the victim's blood and in his pockets were found the coins and watches taken from the Hardy residence. That evening, the defendant orally confessed to Captain Anthony Fabrizi of the Bridgeport police and apologized to Monteith for what he had done to his mother. Three days later he signed a written confession stating that he had planned to kill Hardy because he wanted to move into her house and live with her son and she would not allow it.

*State v. Toste,* 198 Conn. 573, 574–75, 504 A.2d 1036 (1986).

### B.

The defendant claims that oral statements he made the night of his arrest and the written statement made three days later were erroneously admitted by the trial judge. He argues that the state failed to meet its burden of establishing that he "knowingly and intelligently" waived his rights as set forth in *Miranda v. Arizona.* "Specifically, he argues that he had a limited ability to understand the *Miranda* warnings as read to him and that the police did not adequately explain the meaning of his rights." *State v. Toste,* 198 Conn. at 579, 504 A.2d 1036. Because the petitioner presented this same claim to the Connecticut Supreme Court, he has exhausted his state remedies. *See Rose v. Lundy,* 455 U.S. 509, 510, 102 S.Ct. 1198, 1199, 71 L.Ed. 2d 379 (1982).

The record supports the Connecticut Supreme Court's factual findings on the issue of waiver:

> The defendant was brought to the police station immediately after his arrest on Friday, December 20, 1974, [after his second car accident] and was read his *Miranda* rights by Fabrizi. The defendant, after each warning was read, orally indicated that he understood it. He also signed a written form acknowledging

that he understood his rights. The defendant was then given a pat down search which turned up coins and watches from the Hardy home. Fabrizi asked him if he wanted to tell him what had happened at the victim's home and reminded him about the blood on his clothes and the items found in his pockets. The defendant first told Fabrizi that he and another man had gone to the Hardy home but that it was his companion who had killed Hardy. Thereafter, however, the defendant recanted and admitted that he had no accomplice and that it was he who had committed the killing. Fabrizi then told the defendant that they needed his clothes and asked him to remove them. The defendant's reaction to the request was to yell an obscenity and get up from his chair with his hand in a fist. The captain came around the table, slapped the defendant and pushed him back into his chair. After another request for the clothes, the defendant complied.

At this time, the defendant asked if he could see Monteith. When Monteith was brought in, the defendant apologized for what he had done to his mother and explained that he only wanted to live with him. The defendant also indicated to Fabrizi that he needed help and that he did not want to go to jail. Fabrizi told him that he did not have the authority to send him to a mental health facility, but did say that he would ask the court to order a mental evaluation. The defendant was then taken to a cellblock and had no contact with Fabrizi until Monday, December 23.

At about 9 a.m. on Monday, Fabrizi brought the defendant out of his cell and read him his *Miranda* rights in the same fashion as on Friday—stopping after each paragraph and asking him if he understood. The defendant responded affirmatively and again signed an acknowledgment form. Fabrizi then asked the defendant if he wanted to give a written statement concerning the murder, and the defendant agreed. The captain posed questions and typed the defendant's answers. In his statements

the defendant described in detail how he had killed the victim.

Fabrizi testified that he had known the defendant for four or five years. When asked about the defendant's mental capacity, Fabrizi stated that "he operates at about a sixth to seventh grade level, [is] streetwise, communicates well, [has] no extensive vocabulary, but he understands, he comprehends.... He reads very haltingly. His ability to write is not good at all ... he prints most everything." Fabrizi said that on Friday the defendant was nervous and had been drinking, but that he had responded to questions in "good, clear speech" and that his demeanor indicated that "he was all right." Psychological testing admitted during trial on the issue of insanity indicated that the defendant had an IQ in the 68–71 range, was mildly retarded and was of "dull normal" intelligence. A psychiatrist and a clinical psychologist who testified on behalf of the state concluded that he had no thought disorders or any major psychiatric disturbances which would interfere with his ability to understand the nature of the charges against him or to assist his counsel in the preparation of a defense. A clinical psychologist called by the defense testified that the defendant had a profile of a very violent person and had been diagnosed as a "frantic schizophrenic."

*State v. Toste*, 198 Conn at 577–79, 504 A.2d 1036.

After examining the above facts in light of relevant case law, the Connecticut Supreme Court determined that the State had demonstrated that petitioner had knowingly and intelligently waived his *Miranda* rights. *Id.* at 581–83, 504 A.2d 1036. As a preliminary matter, this court must decide whether this last determination is entitled to the presumption of correctness which is afforded a state court's factual findings.

"A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver [of a constitutional right] must depend, in each case, upon the particular facts and

circumstances surrounding the case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). Over a decade ago, the Supreme Court suggested that the question of waiver is not a question of fact in which state court findings are entitled to the presumption of correctness, but rather is a question of law which "requires 'application of constitutional principles to the facts as found'." *Brewer v. Williams,* 430 U.S. 387, 403–04, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977) (quoting *Brown v. Allen,* 344 U.S. 443, 507, 73 S.Ct. 397, 446, 97 L.Ed. 469 (1953)). However, at least one court of appeals regards the Supreme Court's recent opinion in *Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) as calling the *Brewer* Court's determination into question. *See Perri v. Director, Dep't of Corrections,* 817 F.2d 448, 450–51 (7th Cir.1987).

In *Miller v. Fenton,* the petitioner alleged that his confession was obtained in violation of his rights under the Fifth and Fourteenth Amendments. After reviewing the findings of the state courts, the Supreme Court held "that the ultimate issue of 'voluntariness' [of a confession] is a legal question requiring independent federal determination." 106 S.Ct. at 450. Recognizing the difficulty in determining whether a particular issue is one which presents a question of "fact," one of "law," or a "mixed question of fact and law," the Court explained:

> Of course, subsidiary questions, such as the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and familiarity with the *Miranda* warnings, often require the resolution of conflicting testimony of police and defendant. The law is therefore clear that state-court findings on such matters are conclusive on the habeas court if fairly supported in the record and if the other circumstances enumerated in § 2254(d) are inapplicable. But once such underlying factual issues have been resolved, and the moment comes for determining whether, under the totality of the circumstances, the

confession was obtained in a manner consistent with the Constitution, the state-court judge is not in an appreciably better position than the federal habeas court to make that determination.

106 S.Ct. at 453.

The Supreme Court in *Miller v. Fenton,* was not faced with the precise question before this court: "whether federal habeas courts must accord the statutory presumption of correctness to state-court findings concerning the validity of a waiver." *Id.* at 449 n. 3. Prior to *Miller v. Fenton,* some courts concluded that the question of whether a petitioner knowingly and intelligently waived his constitutional right against self-incrimination is a mixed question of law and fact which requires the court to fully examine all the circumstances surrounding the alleged waiver. *See, e.g., Fernandez v. Rodriguez,* 761 F.2d 558, 561 (10th Cir. 1985); *but see Gorham v. Franzen,* 760 F.2d 786, 790 (7th Cir.1985), *cert. denied,* 474 U.S. 922, 106 S.Ct. 255, 88 L.Ed.2d 262 (1986). Since *Miller v. Fenton,* at least two courts of appeals have determined that the ultimate conclusion of a state court on the question of whether a defendant understood his rights, and thus knowingly and intelligently waived them, is a finding of fact which is entitled to the § 2254(d) presumption of correctness. *See Perri,* 817 F.2d at 451; *Ahmad v. Redman,* 782 F.2d 409, 413 (3d Cir.), *cert. denied,* 479 U.S. 831, 107 S.Ct. 119, 93 L.Ed.2d 66 (1986). That conclusion is neither binding nor persuasive. *Cf. SEC v. Shapiro,* 494 F.2d 1301, 1306 n. 2 (2d Cir.1974).

The *Perri* court determined the Supreme Court's analysis in *Miller v. Fenton* implies a rejection of *Brewer v. Williams. See* 817 F.2d at 451. The court reasoned that the question of whether a defendant had knowingly and intelligently waived his rights is not a mixed or legal question because determining whether a suspect "understood" his rights does not require the application of legal principles. "[W]hether a waiver is intelligently made is a factual question, because whether an individual understood his or her rights is an inquiry into his or her state of mind." *Id.* (citing *Miller*

*v. Fenton,* 106 S.Ct. at 451). Thus, "[o]nce a state court finds that a defendant understood each *Miranda* right, then the court has made the necessary subsidiary factual determinations to the conclusion that the defendant has made a knowing and intelligent waiver." *Perri,* 817 F.2d at 451.

This court finds nothing in *Miller v. Fenton* which requires it to reject *Brewer v. Williams,* a decision which has yet to be overruled by the Supreme Court. It is true the Supreme Court stated: "that an issue involves an inquiry into state of mind is not at all inconsistent with treating it as a question of fact," *Miller v. Fenton,* 106 S.Ct. at 451, and "an issue does not lose its factual character merely because its resolution is dispositive of the ultimate constitutional question," *id.* By the same token, a constitutional question does not evaporate simply because, in certain cases, a state court's factual finding is "dispositive" of the ultimate issue. The *Perri* court's analysis blurs an important distinction made by the Supreme Court: "subsidary factual questions ... are entitled to the § 2254(d) presumption," *Miller v. Fenton,* 106 S.Ct. at 451, while "the ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a matter for independent federal determination," *id.* This court can discern no reason for treating one part of the waiver test as a question of fact and the other as a question of law. Accordingly, while the court accepts the findings of fact which support the Connecticut Supreme Court's determination that the petitioner knowingly and voluntarily waived his rights, it holds that the "ultimate question" of whether a waiver has been proved by a preponderance of the evidence to be "knowingly and intelligently made" is a matter for independent federal determination.

## II. Discussion

### A.

As the petitioner states it, "[t]he crux of the claim in this action is that the state failed to produce sufficient evidence from which the trial court could properly conclude that the petitioner understood the warnings given him, the nature of his rights and the consequences of waiving those rights." Petitioner's Memorandum in Support of Motion of Summary Judgment (filed March 9, 1987) at 2. While the petitioner generally asks the court to determine whether the facts, as found by the Connecticut courts, amount to a showing of a valid waiver which is supported by a preponderance of the evidence, the gravamen of his petition is that his low intelligence level compels a finding that he could not understand the meaning of the *Miranda* warning. This court agrees with the Connecticut Supreme Court's conclusion that the petitioner could sufficiently understand the *Miranda* warning and thus "knowingly and intelligently" waived his *Miranda* rights by deciding to speak to the police.

The Fifth Amendment is not "concerned with moral and psychological pressures to confess emanating from sources other than official coercion." *Oregon v. Elstad,* 470 U.S. 298, 304–05, 105 S.Ct. 1285, 1290, 84 L.Ed.2d 222 (1985). In the context of determining whether the confession of a suspect who believed that he was responding to the "voice of God" was involuntary, the Supreme Court refused to make "sweeping inquiries into the state of mind of a criminal defendant who has confessed" unless "coercion brought to bear on the defendant by the State" was also present. *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986). Thus, coercive police activity is a "necessary predicate" to the finding that a confession is involuntary. *Id.; cf. Jurek v. Estelle,* 623 F.2d 929, 941 n. 7 (5th Cir. 1980), *cert. denied,* 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981) (finding that a mentally impaired suspect who was subject to "suggestive interrogation" did not voluntarily confess).

The Supreme Court's decision in *Colorado v. Connelly* is also instructive on the issue of waiver. In explaining why police coercion is a necessary predicate to finding a confession involuntary, the Court opined:

Respondent urges this Court to adopt his "free will" rationale, and to find an attempted waiver invalid whenever the defendant feels compelled to waive his rights by reason of any compulsion, even if the compulsion does not flow from the police. But such a treatment of the waiver issue would "cut this Court's holding in [*Miranda*] completely loose from its own explicitly stated rationale." *Miranda* protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that. Respondent's perception of coercion flowing from the "voice of God," however important or significant such a perception may be in other disciplines, is a matter to which the United States Constitution does not speak.

107 S.Ct. at 524 (citation omitted). Accordingly, the Court refused to establish what it viewed as "a brand new constitutional right—the right of a criminal defendant to confess to his crime only when totally rational and properly motivated." *Id.* at 521.

In *Colorado v. Connelly*, the Supreme Court suggested that a defendant need not be "totally rational" in order to make a valid confession. Yet, the Court also has stated that a "waiver must have been made with full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986); *see also Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747 (1970). However, the requirement that a defendant have "full awareness" is a relative one:

The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege.... The Fifth Amendment's guarantee is both simpler and more fundamental: A defendant may not be compelled to be a witness against himself in any respect. The *Miranda* warnings protect this privilege by ensuring that a suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time. The *Miranda* warnings ensure that a waiver of these rights is knowing and intelligent by requiring that the suspect be fully advised of this constitutional privilege, including the critical advice that whatever he chooses to say may be used as evidence against him.

*Colorado v. Spring*, 479 U.S. 564, 107 S.Ct. 851, 857–58, 93 L.Ed.2d 954 (1987).

■ Thus, the police need not supply a defendant with explanations of all the possible consequences of waiving his rights. *See Oregon v. Elstad*, 470 U.S. at 316, 105 S.Ct. at 1297; *cf. Brady v. United States*, 397 U.S. at 757, 90 S.Ct. at 1473. The defendant need only be supplied with the information which is necessary for a full understanding of the right that is immediately subject to waiver—here, the right not to talk. *See Connecticut v. Barrett*, 479 U.S. 523, 107 S.Ct. 828, 832, 93 L.Ed.2d 920 (1987) ("*Miranda* gives the defendant a right to choose between speech and silence ....") For example, a defendant who is about to plead guilty to charges is waiving several constitutional rights, including the privilege against self-incrimination, the right to a jury trial, and the right to confront one's accusers. *See Chavez v. United States*, 656 F.2d 512, 519 (9th Cir.1981). In such a case, a court must provide the defendant with a rather detailed explanation of the consequences of making his plea. *See Marshall v. Lonberger*, 459 U.S. 422, 436, 103 S.Ct. 843, 852, 74 L.Ed.2d 646 (1983). By contrast, *Miranda* primarily protects the privilege against compulsory self-incrimination during custodial interrogations. The police must determine that a defendant understands that he has the right to remain silent and the right to request an attorney. The police also must determine that a defendant understands that "anything he says may be used against him,"

thus ensuring that the defendant is aware that he is in an adversarial situation. However, most law enforcement officials would be ill-equipped to provide a defendant with reliable information concerning all possible legal implications of any statements which he may choose to make. *Cf. Fare v. Michael C.,* 442 U.S. 707, 722–23, 99 S.Ct. 2560, 2570–71, 61 L.Ed.2d 197 (1979). Therefore, in order to find a valid waiver of *Miranda,* the court need not find that the petitioner had "a full and complete appreciation of all of the consequences flowing from the nature and the quality of the evidence in the case." *Oregon v. Elstad,* 470 U.S. at 317, 105 S.Ct. at 1297. "Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the state's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." *Moran v. Burbine,* 106 S.Ct. at 1142.

The petitioner does not dispute that the police read him his *Miranda* rights before he made each of his statements. The facts indicate that the petitioner was sufficiently alert and that his ability to be attentive to the warnings was unimpaired by either drugs or alcohol. Captain Fabrizi indicated that, although the petitioner could read the transcript of his statement only haltingly on his own, he followed along as Fabrizi read the statement to him. *See* Trial Transcript at 221. The facts indicate that the petitioner was made "aware" of the information set forth in *Miranda,* information which is designed to insure that an individual knows, *inter alia,* that he is free to exercise his right to remain silent. *See Miranda,* 384 U.S. at 467–73, 86 S.Ct. at 1624–27.

■ Whether the petitioner could knowingly and intelligently waive his right to remain silent also requires an assessment of factors including his age, education, intelligence, and prior contact with authorities. *Id.* at 468–69, 86 S.Ct. at 1624–25. Here, the petitioner was an adult and was familiar with police procedures because he had been arrested previously. Moreover, Captain Fabrizi testified that he knew the defendant because he occasionally had come into the police station to chat with officers. *See* Trial Transcript at 208. Fabrizi also testified that the petitioner "operates at about a sixth to seventh grade level," is "streetwise," and communicates relatively well. Although the petitioner had trouble reading the *Miranda* warnings himself, it was Fabrizi's opinion (which the state courts credited) that the petitioner understood those warnings when read to him. *See State v. Toste,* 198 Conn. at 582–83, 504 A.2d 1036. Nothing in the record seriously calls into question Captain Fabrizi's opinion. *Cf. United States v. McClure,* 786 F.2d 1286, 1290 (5th Cir. 1986). Once advised of his rights, the petitioner gave a detailed description of what he did that day. "The lack of hesitancy to speak at that time, his loquacity, and the fact that his answers were in narrative form rather than just monosyllabic 'yes' and 'no' all indicate that he desired to speak and to waive his right to remain silent." *State v. Toste,* 198 Conn. at 583, 504 A.2d 1036.

The psychological testimony indicated that the petitioner is "mildly retarded" and of "dull normal intelligence." It also indicated that he is a person who is prone to committing antisocial acts of violence. However, as suggested by the Connecticut Supreme Court, none of the psychological testimony presented during the trial indicates that the petitioner was unable to understand that he had a right not to speak, that he had a right to have an attorney present, and that the state would use any statements he made to convict him of a crime. *See State v. Toste,* 198 Conn. at 582, 504 A.2d 1036. While the psychological testimony could support a conclusion that the petitioner has a personality disorder, it does not indicate that he is unable to comprehend sufficiently the rights set forth in *Miranda.* His grades in standardized intelligence tests place him in the "mildly retarded" range. *See* 198 Conn. at 579, 504 A.2d 1036. However, low grades in such tests, in and of themselves, do not necessarily imply that an individual has an

inability to decide intelligently whether or not he will speak. Obviously, a waiver of the right to remain silent cannot be held invalid simply because a defendant has less than average intelligence. *See Toliver v. Gathright*, 501 F.Supp. 148, 150 (E.D.Va. 1980). A defendant who is young, is unfamiliar with police procedures, and suffers from a substantial mental deficiency may indeed be incapable of making a waiver. *See, e.g., Henry v. Dees*, 658 F.2d 406 (5th Cir.1981) (uncontradicted testimony that it was unlikely that petitioner could understand the waiver of his rights, coupled with I.Q. of 65–69, indicated waiver, in absence of counsel, not knowingly and intelligently made); *Cooper v. Griffin*, 455 F.2d 1142, 1145 (5th Cir.1972) (15- and 16-year-olds suffering extreme mental deficiency and having no previous experience with criminal process were unable to waive their rights); *but see United States v. Nash*, 414 F.Supp. 1213, 1218 (S.D.Tex.1976) (a person with an I.Q. of 78 could make intelligent waiver). However, a waiver of the right to remain silent is not invalid merely because a defendant is of limited mental capacity. *See United States v. Glover*, 596 F.2d 857 (9th Cir.1979). The preponderance of the facts in the instant case, as found by Connecticut courts, demonstrates that the petitioner knowingly and intelligently waived his right to remain silent.

### B.

The Supreme Court has held that even where a petitioner's statements were obtained in violation of his constitutional rights, he would not be entitled to habeas relief if the admission of his statements were harmless error. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Gorham v. Franzen*, 760 F.2d at 795–96. "Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed." *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101, 3107, 92 L.Ed.2d 460 (1986). A court must determine whether there is a "reasonable possibility" that the improperly admitted evidence contributed to the conviction. *See Holland v. Scully*, 797 F.2d 57, 67 (2d Cir.), *cert. denied*, 479 U.S. 870, 107 S.Ct. 237, 93 L.Ed.2d 162 (1986); *Anderson v. Smith*, 751 F.2d 96, 105–06 (2d Cir.1984).

Apart from the petitioner's statements, the state's evidence against him was substantial and uncontradicted. Immediately after the murder, the petitioner was involved in two automobile accidents. He was arrested after attempting to flee the scene of the second accident. *See* Trial Transcript at 100–12. He was driving the victim's car at the time of the accidents. When the petitioner was brought to the police station, Captain Fabrizi noticed that his clothes were spattered with what turned out to be the victim's blood. The search incident to his arrest uncovered coins and watches belonging to the victim and her son. The defendant voluntarily apologized to the victim's son for killing his mother. Psychological testimony supported other evidence that the petitioner committed the crime. Because the properly admitted evidence established guilt beyond a reasonable doubt, the petitioner is not entitled to habeas relief.

The petition for a writ of habeas corpus is denied.

It is so ordered.